IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY J. JORICH,                      :

      Plaintiff                       :

          v.                            :        3:12-CV-01627

CAROLYN W. COLVIN, ACTING               :        (JUDGE MARIANI)
COMMISSIONER OF SOCIAL
SECURITY,                               :

      Defendant                       :

**FILED
SCRANTON**

MAY 2 9 2014

PER _____

DEPUTY CLERK

## MEMORANDUM

### Introduction

Plaintiff Timothy J. Jorich has filed this action seeking review of a decision of the
Commissioner of Social Security ("Commissioner") denying Jorich's claim for social security
disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and
"insured," that is, the individual has worked long enough and paid social security taxes. The
last date that a claimant meets the requirements of being insured is commonly referred to
as the "date last insured." It is undisputed that Jorich met the insured status requirements
of the Social Security Act through December 31, 2012. Tr. 22, 24, 248. In order to
establish entitlement to disability insurance benefits Jorich was required to establish that he

suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20

C.F.R. §404.131(a)(2008); *see Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

Jorich protectively[1] filed his application for disability insurance benefits on August 6,

2008.  Tr. 22, 248.  Jorich claims that he became disabled on April 17, 2008.  Id.  Jorich has

been diagnosed with several impairments, including cervical, thoracic, and lumbar

spondylosis and stenosis, depression, coronary artery disease, diabetes, and hypertension.

Tr. 24, 107, 118, 428, 431-34, 445.  On November 12, 2008, Jorich's application was initially

denied by the Bureau of Disability Determination.  Tr. 79, 85.

On December 15, 2008, Jorich requested a hearing before an administrative law

judge ("ALJ").  Tr. 22.  The ALJ conducted a hearing on July 28, 2010, where Jorich was

represented by a non-attorney representative.  Tr. 35-73.   On October 7, 2010, the ALJ

issued a decision denying Jorich's application.  Tr. 22-30.  On June 22, 2012, the Appeals

Council declined to grant review.  Tr. 1.  Jorich filed a complaint before this Court on August

17, 2012.   Supporting and opposing briefs were submitted and this case became ripe for

disposition on January 10, 2013, when Jorich filed a reply brief.

Jorich appeals the ALJ's determination on four grounds: (1) the ALJ committed

reversible error by failing to acknowledge or properly evaluate all of Jorich's medically

determinable impairments, (2) the ALJ improperly evaluated Jorich's credibility, (3) the ALJ

improperly evaluated the opinions of two treating physicians, and (4) the ALJ failed to fully

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration
to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date
than the date the application is actually signed.

develop the record.  For the reasons set forth below, this case is remanded to the

Commissioner for further proceedings.

## Statement of Relevant Facts

Jorich is 55 years of age, graduated from high school, and is able to read, write,

speak and understand the English language. Tr.  39, 42-43. Jorich had past relevant work

as a chocolate production machine operator, which is classified as heavy, skilled work.  Tr.

67.  Jorich performed this work for the same employer for approximately nineteen years

prior to his application for disability insurance benefits.  Tr. 254.

### A.      Jorich's Cervical Spinal Impairments

Medical records relating to Jorich's cervical spine impairments begin on February 7,

2007, the date of Jorich's first appointment for physical therapy with Scott Ramsey, DPT.

Tr. 289.  Over the course of the next month, Dr. Ramsey conducted eleven physical therapy

session with Jorich aimed at reducing his back pain, neck pain, and associated headaches.

Tr. 289-97.[2]  At the completion of the physical therapy sessions, Dr. Ramsey noted a ninety-

five percent improvement, with Jorich having a normal range of motion, normal strength,

and a pain of zero on a scale of zero to ten.  Tr. 300.

On August 13, 2007, a magnetic resonance imaging ("MRI") scan was performed on

Jorich's cervical spine.  Tr. 385.  At the C3-C4 level, the MRI showed moderate left

---

[2] Jorich had physical therapy sessions on February 7, 12, 14, 15, 19, 22, 26, as well as March 1, 5, 7, and 8.  Tr. 291-94.

foraminal narrowing and shallow broad posterior disc osteophyte[3] with mild flattening of the anterior surface of the spinal cord. *Id.* At the C4-C5 level, the MRI showed severe left and moderate to severe right foraminal stenosis,[4] and posterior disc osteophyte with mild flattening of the anterior surface of the spinal cord. *Id.* Finally, at the C6-C7 level, moderate bilateral foraminal stenosis was present, as well as posterior disc osteophyte with mild flattening of the anterior surface of the spinal cord. *Id.*

On August 24, 2007, Lori Dunn, DO, began the first of three epidural injections in an attempt to relieve the symptoms associated with Jorich's cervical impairments. Tr. 321. Dr. Dunn noted that Jorich's previous physical therapy with Dr. Ramsey had helped reduce his pain significantly, but repetitive lifting at work had brought the pain back. *Id.*

On August 28, 2007, Jorich visited Amy Adkins, DPT, for an initial evaluation relating to physical therapy sessions. Tr. 304. At the evaluation, Dr. Adkins noted that Jorich suffered from back pain that led to difficulty gripping objects, performing work tasks, or heavy household chores, and led to difficulty lifting more than ten pounds. *Id.* Dr. Akins objective findings included reduced flexibility in Jorich's upper trapezius, hypomobility throughout the thoracic spine, and a painful, albeit full, range of motion in the neck. *Id.* Dr. Adkins also found that Jorich had 4-/5 strength in his serratus anterior, 3+/5 strength in his

---

[3] Osteophytes are also referred to as bone spurs; they are "bony projections that develop along the edges of bones." Mayoclinic.com, Bone Spurs Definition, *available at* http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478 (last visited May 5, 2014).

[4] Stenosis is "a narrowing of the open spaces within [the] spine . . . stenosis can cause pain, numbness, muscle weakness, and problems with bladder or bowel function." Mayoclinic.com, Spinal Stenosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited May 5, 2014).

mid-trapezius, and 3+/5 strength in his latissimus dorsi. *Id.* Over the course of six physical therapy sessions,[5] Jorich saw no improvement, continued pain, and continued difficulty gripping objects. Tr. 312-13.

On September 13, 2007, Jorich presented to Dr. Dunn for the second of three epidural injections. Tr. 324. At this appointment, Jorich stated that the first epidural injection had not provided him with any relief, and that his physical therapy sessions over the past month had "actually worsened his symptoms." *Id.* On October 4, 2007, Jorich received his third and final epidural injection from Dr. Dunn. Tr. 319. Jorich reported that the epidural injections had provided him with, at most, ten percent relief of his symptoms. *Id.*

On November 6, 2007, Jorich was examined by William Beutler, MD, for a spinal consultation. Tr. 325. At this appointment, Jorich noted neck pain, but denied low back or lower extremity symptoms. *Id.* Dr. Beutler recorded normal strength and reflexes in Jorich's extremities, as well as a normal gait. *Id.* Dr. Beutler noted that Jorich's previous MRI showed mild spondylosis and left foraminal narrowing, and recommended that Jorich maintain a twenty pound lifting limit and avoid repetitive bending or twisting. Tr. 325-26.

On July 11, 2008, Jorich was examined by Daniel Kambic, DO for a follow-up appointment. Tr. 120. Dr. Kambic stated that Jorich's neck issues were severe enough that he required surgery; however, Jorich first required a heart catheterization and stents before

---

[5] Jorich had physical therapy sessions on August 28, 29, 31, and September 3, 4, and 6. Tr. 303.

he would be medically cleared for a cervical spine operation. *Id.* While Jorich complained of serious and uncontrolled neck pain, Dr. Kambic noted that, without surgery, there was "nothing [he] could do to fix the spine . . ." *Id.* Dr. Kambic further stated that conservative therapy, epidural shots, and physical therapy had failed. *Id.* While IV Decadron shots had somewhat eased the pain, Dr. Kambic believed Jorich could not be kept on steroid injections long term. *Id.* Finally, Dr. Kambic noted that Jorich's pain and depression were "feeding on each other." *Id.* At this appointment, Jorich was diagnosed with cervical disc syndrome, coronary artery disease, depression/anxiety, hypertension, and hyperlipidemia. *Id.* Dr. Kambic conducted a follow-up on August 8, 2008. Tr. 199. Dr. Kambic noted that surgery for Jorich's spinal issues was not an option since Jorich could not be taken off of Plavix, a blood thinner that he was prescribed following heart surgery. *Id.* Jorich continued complaining of neck pain and associated weakness, although a physical examination was essentially normal and revealed 5/5 strength in all extremities. *Id.*

On August 27, 2008, Jorich was examined by Amy Zellers, DO. Tr. 118. Jorich reiterated that his neck issues caused pain and tingling down his arms, and stated that the pain had become unbearable. *Id.* Dr. Zellers noted that, because Jorich was taking Plavix, the earliest that he could have neck surgery was April 2009. *Id.* On September 12, 2008, Jorich presented to Dr. Beutler for a follow-up appointment. Tr. 379. Jorich discussed worsening neck pain that radiated down through his shoulders. *Id.* Dr. Beutler noted a mostly normal physical examination, with some stiffness present in Jorich's neck. *Id.*

On September 15, 2008, another MRI scan was performed on Jorich's cervical spine. Tr. 112. This MRI revealed marked left foraminal stenosis at the C3-C4 level, with moderate hypertrophic changes as compared to the previous MRI. *Id.* At the C4-C5 level, the MRI revealed marked left and mild right foraminal stenosis and a very small central disc protrusion or herniation, and moderate central canal compromise or stenosis. *Id.* At the C5-C6 level, there was mild foraminal stenosis, mild posterior ridge formation, and mild central canal compromise or stenosis. *Id.* Finally, at the C6-C7 level, there was a very small central disc protrusion or herniation. *Id.*

On October 10, 2008, Jorich returned to Dr. Beutler for a follow-up. Tr. 128. Jorich stated that he continued to have neck pain, but the pain level had decreased since he was put on disability leave. *Id.* A physical examination was essentially normal, with normal strength, sensation, and reflexes, but stiffness associated with Jorich's range of motion in the neck. *Id.* Dr. Beutler noted that the September 2008 MRI revealed foraminal stenosis primarily from the C3 to C5 vertebrae with mild canal stenosis at the C5-C6. *Id.* After reviewing surgical options, Dr. Beutler and Jorich agreed that a conservative approach to treatment would be best. *Id.*

Over the next year, Jorich had multiple appointments with several doctors who attempted to alleviate his cervical spine issues. Tr. 100, 103, 107, 108, 109, 408-09, 410, 413, 415, 418, 427, 432, 433, 434, 435, 436, 438, 441.[6] The doctors continued to note

---

[6] Jorich had the following appointments during this time period:

7

cervical stenosis and neuritis, with continued pain, tingling, and numbness in the arms and hands. *Id.* Despite treatments including epidural shots, medications, and a TENS unit,[7] Jorich's symptoms did not abate for any period greater than ten days. *Id.*

On April 14, 2009, another MRI of Jorich's cervical spine was performed. Tr. 446. The results of this MRI showed multilevel spondylitic changes of the cervical spine with canal stenosis most pronounced at the C4-C5 level. *Id.* The MRI also revealed multilevel foraminal stenosis, most pronounced at the C3-C4 and C4-C5 level. *Id.* On September 22, 2009, a final MRI of the cervical spine was performed. Tr. 444. The MRI revealed no significant changes from the April 2009 MRI. *Id.*

### B.    Jorich's Lumbar and Thoracic Spine Impairments

On January 14, 2009, an MRI scan was performed on Jorich's lumbar spine. Tr. 448. This MRI revealed multilevel spinal stenosis and central to right paracentral disc herniation with moderate to severe bilateral foraminal stenosis at the L5-S1 level. *Id.* The MRI also revealed degenerative changes at multiple levels of the lumbar spine as compared to a 2006 MRI. *Id.*

---

Allen Kao, MD: November 4, 2008, November 5, 2008, December 12, 2008, December 15, 2008, January 9, 2009, February 13, 2009, June 9, 2009, and July 14, 2009.

Williams Rolle, Jr., MD: October 22, 2008, December 11, 2008, January 9, 2009, June 9, 2009, June 25, 2009, and July 14, 2009.

Hayden Boyce, MD: April 16, 2009, and April 30, 2009.

Timothy Reiter, MD: October 29, 2009, and November 19, 2009.

Michael Lupinacci, MD: May 14, 2009, July 23, 2009, September 17, 2009, October 1, 2008, October 12, 2009, and February 11, 2010.

[7] TENS is short for transcutaneous electrical nerve stimulation, this device "sends pulses of battery-generated electrical current to key points on a nerve pathway via electrodes taped to your skin." Mayoclinic.com, Transcutaneous Electrical Nerve Stimulation, *available at* http://www.mayoclinic.org/tens/img-20006686 (last visited May 5, 2014).

On May 20, 2009, an MRI scan was performed on Jorich's thoracic spine. Tr. 445. This MRI revealed mild degenerative spondylosis[8] in the lower levels of the thoracic spine, with interval worsening when compared with a 2002 MRI. *Id.* The MRI also showed a mild non-compressive disc bulge at the T8-T9 level. *Id.*

On February 13, 2009, Jorich presented to Dr. Kao for a follow-up to his cervical issues, and complaining of lower back pain. Tr. 434. Jorich's physical examination was normal, with an unrestricted range of motion with no pain present. *Id.* Based on the January 2009 MRI, Dr. Kao diagnosed Jorich with multilevel spondylosis, multilevel spinal stenosis, and moderate to severe bilateral neural foraminal stenosis at the L5-S1 level. *Id.*

On May 14, 2009, Dr. Lupinacci conducted a follow-up examination regarding Jorich's cervical issues and low back pain. Tr. 433. Jorich's physical examination was normal, although Dr. Lupinacci diagnosed Jorich with lumbar spondylosis, multilevel lumbar spinal stenosis, and neuroforaminal stenosis. *Id.* On June 25, 2009, Dr. Rolle Jr. examined Jorich. Tr. 432. Dr. Rolle Jr. reviewed Jorich's thoracic spine MRI results, and concluded that Jorich suffered from degenerative spondylosis and a mild noncompressive disc bulging at the T8-T9 level. *Id.* Jorich reported a continued burning sensation around the T8-T9 level. *Id.* Dr. Rolle Jr. reiterated a diagnosis of lumbar neuritis and cervical neuritis. *Id.* Between July 23, 2009 and February 11, 2010, Jorich had five more follow-up appointments

---

[8] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck. As the disks dehydrate and shrink, bone spurs and other signs of osteoarthritis develop." Mayoclinic.com, Cervical Spondylosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (last visited May 5, 2014).

with Dr. Lupinacci. Tr. 427-31. Dr. Lupinacci maintained his diagnoses of thoracic neuritis, lumbar neuritis and spondylosis, and cervical neuritis. *Id.* Dr. Lupinacci's physical examinations of Jorich were consistently normal, with normal strength and reflexes. *Id.*

### C.   Jorich's Other Physical Impairments

On October 28, 2007, Jorich presented to Thach Nguyen, MD with chest pain. Tr. 343. Jorich was found to be suffering from a myocardial infarction, and Dr. Nguyen performed an angiography and ventriculography. *Id.* These tests revealed significant occlusion within Jorich's heart. *Id.* Dr. Nguyen thereafter successfully placed several stents within Jorich's coronary arteries and prescribed Jorich Plavix. Tr. 344, 346. William Apollo, MD noted that this had been Jorich's second myocardial infarction, the first having occurred in 1996. Tr. 356.

On April 17, 2008, Jorich was again hospitalized with cardiac issues. Tr. 365. Tests revealed re-stenosis in his coronary arteries; an additional stent was placed in Jorich coronary artery, and angioplasty surgery was performed. *Id.* Doctors continued Jorich on Plavix. Tr. 366.

Jorich has also apparently been diagnosed with fibromyalgia by Dr. Alan Roumm. Tr. 427. However, none of Dr. Roumm's medical records were contained within the administrative record, and the only indication of such a diagnosis comes from Dr. Lupinacci's medical reporting noting this diagnosis by Dr. Roumm. *Id.* Jorich was also diagnosed with diabetes and hypertension; the diabetes diagnosis was supported by

multiple blood tests showing extremely elevated glucose levels, high hemoglobin counts, and high C-Peptide levels.  Tr. 113-17, 121-26.

### D.      Jorich's Mental Impairments

Between March 2010 and May 2010, Jorich attended three counseling sessions for depression with Mary Jo Devlin, LSCW.  Tr. 451-57. Ms. Devlin reported that Plaintiff had a severely disordered sleep, feelings of helplessness and hopelessness, pronounced irritability, lack of initiative, highly impaired concentration, extreme forgetfulness, and feelings of worthlessness.  Tr. 452.  However, Ms. Devlin reported that Jorich's alertness, orientation, behavior/psychomotor speed, speech, thought process, thought content, judgment, and insight were within normal limits.  Tr. 452.  Ms. Devlin assigned Jorich Global Assessment of Functioning ("GAF") scores of 50 and 60.  Tr. 452, 455.  Ms. Devlin diagnosed Jorich with depression and post-traumatic stress disorder ("PTSD") and opined that Jorich's forgetfulness, exhaustion, and poor concentration rendered him unable to work, particularly in light of the fact that Jorich had forgotten two appointments with her.  Tr. 453, 458.

Ms. Devlin felt that Jorich's depression was too severe to be treated with individual psychotherapy, and she therefore recommended that Jorich participate in partial hospitalization at Holy Spirit Hospital.  Tr. 454.  On June 9, 2010, Jorich was examined by Sylvestre De La Cruz, MD at Holy Spirit Hospital.  Tr. 462.  Dr. Cruz noted that Jorich complained of a loss of appetite and motivation, feelings of hopelessness, and feeling of

worthlessness, among other things. Tr. 462-65. Dr. Cruz diagnosed Jorich with major

depression, recurrent and severe, and mood disorder. Tr. 464. Dr. Cruz assigned Jorich a

GAF score of 40-45. *Id*. Thereafter, Jorich was admitted to Holy Spirit Hospital's mental

health program from June 14, 2010 until July 7, 2010. Tr. 466. At the completion of this

program, the hospital staff noted significant improvement and believed Jorich was able to

function with a less restrictive level of care. *Id*.

### E.   Physician Residual Functional Capacity Assessments

On November 10, 2008 a state agency physician, Candelaria Legaspi, MD,

completed a residual function capacity assessment. Tr. 386. Dr. Legaspi concluded that

Jorich was able to occasionally lift up to twenty pounds, and could frequently lift up to ten

pounds. Tr. 387. Dr. Legaspi opined that Jorich had no other physical limitations. Tr. 387-

89. This assessment was completed prior to the January 14, 2009 MRI showing that Jorich

suffered from lumbar spine impairments, and prior to the May 20, 2009 MRI showing that

Jorich suffered from thoracic spine impairments.

On February 18, 2009, Dr. Kambic, one of Jorich's treating physicians, completed a

residual functional capacity assessment wherein he opined that Jorich's cervical and lumbar

disc diseases rendered him capable of sitting, standing, or walking for only one hour each

during an eight hour workday. Tr. 399. Dr. Kambic further stated that while Jorich was

capable of grasping, pushing or pulling, and manipulating objects with his right hand, he

could not do these activities with his left hand. *Id*. Dr. Kambic believed that Jorich could

occasionally lift up to forty-nine pounds, and could occasionally bend, squat, crawl, and climb, but could never reach above shoulder level with his right arm. Tr. 399-400. Dr. Kambic stated that Jorich could not work around unprotected heights or moving machinery, and that he had moderate restrictions in his ability to tolerated marked changes in temperature and humidity. Tr. 400. Finally, Dr. Kambic opined that Jorich would probably miss one day of work per month due to his medical impairments, would often experience fatigue, weakness, or pain sufficient to interfere with his attention and concentration, and would require unscheduled breaks of up to one hour during a work day. *Id.*

On April 7, 2009, Dr. Beutler, another of Jorich's treating physicians, completed a residual functional capacity assessment. Tr. 402. Dr. Beutler did not offer an opinion of Jorich's sitting, standing, or walking limitations, but opined that Jorich was capable of simple grasping, pushing or pulling, or fine manipulation with both hands, and could use his feet to operate foot controls. *Id.* Dr. Beutler believed that Jorich could occasionally lift up to nine pounds. *Id.* Dr. Beutler also opined that Jorich was able to occasionally bend, squat, crawl, or reach above shoulder level, but could never climb, could not be around unprotected heights, and had moderate restrictions in his ability to be around moving machinery or be exposed to marked changes in temperature or humidity. Tr. 403. Dr. Beutler concluded by stating that, when he last met with Jorich, Jorich did not appear to be employable. *Id.*

### F.    The Administrative Hearing

On July 28, 2010, Jorich's administrative hearing was conducted.  Tr. 35-73.  Jorich

testified that he could only do light household chores due to his impairments.  Tr.  59.  He

also testified that he could sit comfortably for approximately one to one and a half hours

before he would need to lie down due to pain.  *Id.*  Jorich testified that he needed to lie

down about four times per day, for approximately one hour each time.  Tr. 59-60.  He further

stated that he could stand for approximately forty-five minutes to one hour before his back

started to tighten up.  Tr. 61-62.  Jorich also stated that on an average day he experienced

pain on a level of approximately six out of ten, although he had good days and bad days,

with good days coming once per week if he was lucky.  Tr. 60.  Jorich testified that his pain

radiated into his hands, causing him to drop objects on a daily basis.  Tr. 63.  Jorich stated

that, though doctors had originally recommended surgery to address his cervical

impairments, they later decided that surgery was not worth the risk.  Tr. 49.  Jorich also

testified that he felt depressed.  Tr. 61.  However, Jorich also stated that he had been

discharged from outpatient depression-therapy at Holy Spirit Hospital because the doctors

there were satisfied that medication helped improve his depression.  Tr. 45-46.

After Jorich testified, Brian Biarly, an impartial vocational expert, was called to give

testimony.  Tr. 65.  The ALJ asked the vocational expert to assume a hypothetical individual

with Jorich's age, education, and work experience who was limited to medium work,[9] but was limited to occasionally climbing stairs, and could never climb ropes, ladders, or scaffolding. Tr. 68-69. Furthermore, the hypothetical individual could kneel, crouch, or squat only occasionally, and could never crawl. Tr. 69. The ALJ further proposed that this hypothetical individual could only occasionally reaching overhead bilaterally, could only occasionally be exposed to extreme cold or concentrated exposure to liquids, and must avoid loud and very loud noise intensities. *Id.* The hypothetical individual must avoid working in high, exposed places, around fact moving machinery, or around sharp objects, and must avoid working with toxic or caustic chemicals. *Id.* Finally, the hypothetical individual was limited to unskilled work. *Id.* For a second hypothetical, the ALJ left all limitations in place except that the hypothetical individual was limited to only light work.[10] Tr. 70.

The vocational expert opined that this hypothetical individual, limited to medium work, would be capable of working as a dining room attendant. *Id.* The vocational expert testified that, if the hypothetical individual were limited to light work, he would be able to

---

[9] Medium work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work." 20 C.F.R. § 416.967.

[10] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

perform two jobs that existed in significant numbers in the national economy; a sales

attendant and a housekeeping cleaner. *Id.* Finally, the ALJ proposed another modification

to the hypothetical question. Tr. 70-71. The ALJ maintained a light work limitation, with all

other limitations intact, but further required that the hypothetical individual must be able to

alternate between sitting and standing at will. *Id.* The vocational expert testified that, with

this additional limitation, the individual would still be able to perform two jobs that existed in

significant numbers in the national economy; an electrical accessories one assembler, and

a small products two assembler. Tr. 71. On examination by Jorich's representative, the

vocational expert stated that if the hypothetical individual had to lie down two times per day

for approximately one hour each time, the individual would be unable to work. Tr. 72.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision

denying a plaintiff's claim for disability benefits, the district court must uphold the findings of

the Commissioner so long as those findings are supported by substantial evidence.

Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), quoting *Consolidated Edison*

*Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*,

845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,

(4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason*, 994 F.2d at 1064.

### A.    Step One

The ALJ at step one of the sequential evaluation process found that Jorich had not engaged in substantial gainful work activity since April 17, 2008, the date of his application for benefits. Tr. 24.  No error is alleged here.

### B.    Step Two

At step two of the sequential evaluation process, the ALJ found that Jorich only suffered from one severe impairment: cervical spondylosis and stenosis. Tr. 24.  The ALJ further determined that Jorich suffered from two non-severe impairments: coronary artery disease, and depression. Tr. 24-25. The ALJ found that Jorich's allegations of fibromyalgia were not supported by clinical evidence, and thus found that fibromyalgia was not a medically determinable impairment. Tr. 24.  Jorich contends that the ALJ committed reversible error in failing to consider all of Jorich's medically determinable impairments at

step two and failing to give adequately consideration to Jorich's depression and coronary artery disease.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments at step two and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairment at step two of the sequential evaluation process is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.

If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005). However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Shannon v. Astrue, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D.Pa. April 11, 2012)(Rambo, J.); Bell v. Colvin, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D.Pa. Dec.

19

23, 2013)(Nealon, J.); *Stape v. Colvin*, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6

(M.D.Pa. April 14, 2014)(Brann, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

At step two of the sequential evaluation process, the ALJ found that Jorich did suffer

from a severe impairment.  Tr. 24.  As a result, though the ALJ found depression and

coronary artery disease to be non-severe, tr. 24-25, any possible error in this finding is

harmless.  *Rutherford*, 399 F.3d at 553.  Furthermore, the ALJ did not err in failing to

consider allegations of post-traumatic stress disorder ("PTSD").  The Social Security

Administration regulations require evidence from an acceptable medical source to establish

any medically determinable impairment.  20 C.F.R. § 404.1513(a).  A licensed clinical social

worker is not an acceptable medical source, but is considered an "other source" under the

Social Security Administration regulations.  20 C.F.R. § 404.1513(d)(3); SSR 06-03p, 2006

WL 2329939, at *2 (S.S.A. August 9, 2006).  "Information from these 'other sources' cannot

establish the existence of a medically determinable impairment."  SSR 06-03p, 2006 WL

2329939, at *2.  Here, the only individual who diagnosed Jorich with PTSD was Mary Jo

Devlin, a licensed clinical social worker.  Tr. 458.  Ms. Devlin's opinion alone is insufficient

to establish PTSD as a medically determinable impairment, and consequently, the ALJ did

not err in failing to consider this impairment.

However, the ALJ did err in failing to consider Jorich's lumbar and thoracic

spondylosis and stenosis.  The administrative record demonstrates that five different

doctors conclusively diagnosed Jorich with lumbar spondylosis and/or stenosis based on

objective MRI findings. Tr. 408-09, 431, 432, 433, 434, 448. Three doctors diagnosed Jorich with thoracic spondylosis and stenosis based on objective MRI findings. Tr. 428, 431, 432, 445. Consequently, Jorich's lumbar and thoracic spondylosis and stenosis impairments were medically determinable, and should have been considered by the ALJ at steps two and four.

The failure of the ALJ to find lumbar and thoracic spondylosis and stenosis as medically determinable impairments, or to give an adequate explanation for discounting them, makes the ALJ's decisions at steps two and four of the sequential evaluation process defective. The error at step two of the sequential evaluation process draws into question the ALJ's residual functional capacity assessment and the assessment of Jorich's credibility. The ALJ found that Jorich's medically determinable impairments could reasonably cause his alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. Tr. 27. This determination by the ALJ was based on an incomplete and faulty analysis of all of Jorich's medically determinable impairments. Furthermore, it cannot be said that this error was harmless. Jorich claimed that his back pain required him to lie down approximately four times per day for one hour each time. Tr. 59-60. The vocational expert testified that such requirements would interfere with an individual's ability to perform any work whatsoever. Tr. 72. Thus, if the ALJ had accepted Jorich's testimony as true, the ALJ would have been required to find Jorich disabled. Therefore, on remand, the ALJ must properly consider and assess Jorich's

medically determinable impairments of lumbar and thoracic spondylosis and stenosis, as well as diabetes and hypertension.[11]

## C.   Step Three

At step three, the ALJ concluded that Jorich did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 18. Jorich does not allege error with this finding.

## D.   Step Four

At step four of sequential evaluation process, the ALJ found that Jorich maintained the residual functional capacity to perform a light work. Tr. 26. The ALJ found that Jorich was limited in performing work inasmuch as he could only occasionally climb stairs, and could never climb ropes, ladders, or scaffolding, could kneel, crouch, or squat only occasionally, and could never crawl. *Id.* The ALJ also found that Jorich required two unscheduled breaks each day, and must be able to alternate positions at will. *Id.* Furthermore, the ALJ found that Jorich could only occasionally reach overhead bilaterally, could only occasionally be exposed to extreme cold or concentrated exposure to liquids, and must avoid loud and very loud noise intensities. *Id.* Finally, the ALJ concluded that Jorich must avoid working in high, exposed places, around fast moving machinery, around sharp objects, and must avoid working with toxic or caustic chemicals. *Id.*

---

[11] Jorich also notes that the ALJ did not consider Jorich's diabetes and hypertension. Jorich has not alleged that either impairment would contribute to an inability to work; consequently these impairments likely would not have affected the outcome of the case. *See, Rutherford*, 399 F.3d at 553. However, in light of the fact that remand is necessary because of other errors, on remand the ALJ should also consider the impact that these medically determinable impairments may have on Jorich's residual functional capacity.

The ALJ posed a hypothetical question to the vocational expert that accurately depicted these limitations. Tr. 69-71. Based on this hypothetical question, the vocational expert testified that such a hypothetical individual would be able perform jobs that exist in sufficient numbers in the national economy. Tr. 71. However, in arriving at the aforementioned residual functional capacity, the ALJ committed two errors. As noted in the step two analysis, the ALJ failed to consider several medically determinable impairments; this failure calls into question the ALJ's determination of Jorich's credibility when the ALJ reached a residual function capacity determination. In addition to the error noted in step two, the ALJ improperly rejected the opinion of Jorich's treating physicians.

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit and by all of the federal circuits. *See, e.g., Morales v. Apfel,* 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." *Id.* In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. *Id.*

The ALJ rejected the opinion of one of Jorich's treating physicians, Dr. Beutler, for three reasons. Tr. 28. First, the ALJ asserted that Dr. Beutler's opinion was "of little

probative value" because Dr. Beutler did not complete the section of the residual functional capacity evaluation form that described Jorich's limitations in sitting and standing/walking. *Id*. However, simply because Dr. Beutler did not offer an opinion as to certain physical limitations does not invalidate the doctor's otherwise legitimate opinions of Jorich's other functional limitations.

Second, the ALJ rejected Dr. Beutler's opinion because the limitations he placed on Jorich's lifting and carrying ability were "overstated as supported by the objective findings, which indicate only 'mild' degenerative disc disease[.]" *Id*. This assessment of Jorich's medical condition is inaccurate. Not only did the ALJ ignore all medical evidence relating to Jorich's thoracic and lumbar impairments, but the ALJ misinterpreted the data relating to Jorich's cervical impairments. It is true that certain of Jorich's cervical impairments, such as the central canal stenosis and right foraminal stenosis were described by doctors as mild. Tr. 108, 112. However, a September 2008 MRI showed "marked" left foraminal stenosis, and showed moderate central canal compromise at the C4-C5 level. Tr. 112, 383.

Third, the ALJ rejected Dr. Beutler's opinion because Jorich "only required conservative treatment since the alleged disability onset date. Tr. 28. Even if physical therapy, multiple pain medications, the use of a TENS unit, and multiple epidural shots could properly be characterized as conservative, this treatment plan did not, on its own, establish that Jorich did not have significant limitations caused by his medically

24

determinable impairments. Thus, the ALJ rejected Dr. Beutler's opinion "for the wrong reason." *Morales*, 225 F.3d at 317.

The ALJ also rejected the opinion of Jorich's other treating physician, Dr. Kambic, on the basis that Dr. Kambic's opinion was internally inconsistent and was not supported by "fairly benign objective findings or the fact that the claimant reported functioning better and doing well." Tr. 27-28. The ALJ's belief that the medical findings in this case were "fairly benign" is flawed because, as noted above, the ALJ either missed or misinterpreted the key medical evidence contained within the administrative record. Additionally, the ALJ's assertion that Dr. Kambic's assessment was internally inconsistent is likewise flawed. The ALJ believed that limiting Jorich to one hour of standing, walking, or sitting each (for a total of three hours) out of an eight hour workday was not consistent with the ability to occasionally lift up to forty-nine pounds. Tr. 27. However, Social Security Ruling 83-10 defines "occasionally" as "from very little up to one third of the time." This means that, in Dr. Kambic's opinion, Jorich was capable of lifting this weight for a maximum of two hours and forty minutes throughout the workday. This lifting could be done while standing, walking, or sitting, which Jorich was capable of doing for three hours during the day. There is nothing internally inconsistent in these findings, and consequently, the ALJ also rejected Dr. Kambic's opinion for the wrong reasons.

It is obvious that Dr. Kambic's opinion and Dr. Beutler's opinions are at odds, and the ALJ cannot accept both opinions as entirely valid. The ALJ must necessarily discredit one,

or perhaps both, of these opinions. However, the ALJ must appropriately consider these opinions, and may only reject them for valid reasons. As the ALJ's assessment of Jorich's credibility was flawed, and the ALJ rejected the opinions of both treating physicians for improper reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence.

### E.   Step Five

At step five, the ALJ concluded that, given Jorich's residual functional capacity, he was capable of performing two jobs that exist in significant numbers in the national economy. Tr. 29. In making this determination, the ALJ posed a hypothetical question to a vocational expert that reflected the ALJ's flawed residual functional capacity assessment. Tr. 67-71. The vocational expert testified that under the circumstances presented in the hypothetical question, the individual would be able to perform three jobs that exist in significant numbers in the national economy. Tr. 71.

As the residual functional capacity used by the ALJ was flawed, the hypothetical question posed by the ALJ did not accurately reflect Jorich's actual ability to work. Therefore, the ALJ's determination that Jorich could perform jobs that exist in a significant number in the national economy is not supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner

is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of

the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.


BY THE COURT:


Robert D. Mariani
United States District Judge


Dated: May 29 , 2014